FILED

2009 Jul-15  PM 03:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RODRICKUS B. JONES** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO. CV-07-BE-2031-S** |
| | ) | |
| **MICHAEL J. ASTRUE** | ) | |
| **Commissioner of the Social,** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I. Introduction**

On April 22, 2003, Teresa Shepard filed an application for supplemental security income on behalf of her fourteen year old son, the claimant, Rodrickus B. Jones, pursuant to Section 1614(a)(3)(C) of the Social Security Act**.** (R. 19). The Commissioner denied the claim. The claimant filed a timely request for a hearing. The claimant and his mother appeared and testified before the ALJ on November 2, 2005 in Birmingham, Alabama. (R. 19). On January 27, 2006, the ALJ issued an unfavorable ruling. Subsequently, on September 6, 2007, the Appeals Council denied the claimant social security benefits, serving as the Social Security Administration's final decision and the exhaustion of the claimant's administrative remedies. This case is now before the court for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

1

Based on the court's review of the record in the case and the parties' briefs, this court will AFFIRM the decision of the Commissioner.

## II. Issues Presented

The claimant presents the following issues for review: (1) whether the ALJ properly found that the claimant's impairments failed to satisfy the second prong of Listing 112.05; and (2) whether the ALJ properly rejected the opinion of a consultive psychologist.

## III. Standard of Review

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. Furthermore, this court does not reweigh evidence or substitute its judgment for that of the Commissioner, but instead reviews the entire record to determine if the decision reached is supported by substantial evidence. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Finally, the claimant has the burden of proving that an impairment meets or equals a listed impairment. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991). The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999.  A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

### IV. Legal Standard

"A claimant under the age of 18 shall be considered disabled. . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Social Security regulations provide a three-step sequential analysis to determine whether a child is disabled. See 20 C.F.R. § 416.924(a). The first question is whether the claimant is engaged in substantial gainful employment; if so, the claimant is not disabled.

If the claimant is not engaged in substantial gainful employment, the second question is whether the claimant has severe impairment. For an individual who has not attained the age of 18, a medically determinable impairment or combination of impairments is not severe if it is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations. If the claimant does not have a severe impairment, the claimant if not disabled.

If the claimant does have a severe impairment, the third question is whether the impairment meets or equals those contained in the Listing of impairments found in 20 C.F.R. §

404.1520(e). If so, the child is conclusively disabled. If not, the child is not disabled. *Id.*; *see also*

*Wilson v. Apfel*, 179 F.3d 1276, 1278 n.1 (11th Cir. 1999). To "meet" a Listing, "a claimant must

have a diagnosis included in the Listings and must provide medical reports documenting that the

conditions meet the specific criteria of the Listings and the duration requirement." *Wilson v.*

*Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002). To medically "equal" a listing, the medical

determinations must be "at least equal in severity and duration to the listed findings." 20 C.F.R. §

404.1523(a)-(d); *Wilso*n, 284 F.3d at 1224. If the additional impairment(s) did not cause

limitations that are "severe" as defined in § 416.924(C), then the additional impairment(s) fails to

impose the required additional and significant limitation function. 20 C.F.R. Pt. 404, subpt. P,

App. 1 § 112.00A.

In determining whether an impairment or combination of impairments *functionally* equals

the Listings, the adjudicator must assess the claimant's functioning in terms of six domains: (1)

acquiring and using information; (2) attending and completing tasks; (3) interacting and relating

with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and

physical well-being. 20 C.F.R. § 416.926a(b)(1). In making this assessment, the adjudicator must

compare how appropriately, effectively, and independently the claimant performs activities

compared to the performance of other children of the same age who do not have impairments. To

functionally equal the Listings, the claimant's impairment or combination of impairments must

result in "marked" limitations in two domains of functioning or an "extreme" limitation in one

domain. 20 C.F.R. § 416.926a(d).

In assessing whether the claimant has "marked" or "extreme" limitations, the adjudicator

must consider the functional limitations from all medically determinable impairments, including

4

any impairments that are not severe on their own. 20 C.F.R. § 416.926a(a). The adjudicator must consider the interactive and cumulative effects of the claimant's impairments or combination of impairments individually in each domain. 20 C.F.R. § 416.926a(c).

A child has a "marked" limitation in a domain when his impairment(s) "seriously interferes" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). A "marked" limitation is "more than moderate" and "less than extreme." A "marked" limitation is the equivalent of functioning that would be expected on standardized testing with scores that are at least two but less than three standard deviations below the mean; a valid score that is two standard deviations but less than three standard deviations below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and a day-to-day functioning in domain-related activities consistent with that score.

## V. **Facts**

The claimant, Rodrickus Jones, was seventeen at the time of the ALJ's decision. (R. 19). The claimant was in the tenth grade. (R. 19). He alleges disability based on a learning disability with an April 30, 2003 onset date. (R. 20).

On July 10, 2003, R.L. Meredith, Psy. D., a licensed psychologist, examined the claimant. (R. 99). Dr. Meredith noted that the claimant had failed seventh grade, and had never received special education. (R. 100). Furthermore, Dr. Meredith reported that the claimant's relationship with teachers had been average, and his general outlook concerning school was positive. (R. 100). However, Dr. Meredith noted the claimant's school performance had been "characterized by occasional disciplinary problems." (R. 100). The reported problems included "short attention spand [sic], ease of distractibility and difficulty finishing work."(R. 100).

Dr. Meredith further noted that the claimant stated he did not drink alcohol, smoke, or have any history of drug use. (R. 100). Additionally, the claimant denied, and did not display, a history of depression or anxiety, and reported no behavioral problems concerning home life other than being reminded to finish chores. (R. 100-01). In fact, Dr. Meredith determined the claimant could cooperate and had an "essentially normal mood." (R. 101). Furthermore, Dr. Meredith reported that the claimant did not steal, run away, destroy property, throw tantrums, set fires or argue excessively. ( R. 100). The claimant stated that his usual daily activities consisted of playing sports with friends, watching television, and playing video games. (R. 100). Dr. Meredith found no notable restriction on the claimant's daily schedule. (R. 100).

Also, Dr. Meredith found that the claimant's personal hygiene was adequate (R. 100), and his "self-care skills were adequately developed." (R. 101). The claimant's "interpersonal attitude was cooperative." (R. 100). His immediate memory was excellent, and Dr. Meredith further noted that the claimant had no concentration problems. (R. 100). Though Dr. Meredith reported the claimant demonstrated "minimal self-understanding and poor reasoning skills," he was "socially appropriate with good impulse control skills." (R. 101).

Dr. Meredith then explained the claimant's Cognitive Assessment Results based on the Wechsler Intelligence Scale for Children. (R. 101). The claimant achieved a verbal IQ score of 67, a Performance IQ score of 64, and a "resulting Full Scale IQ Score of 63." (R. 101). Dr. Meredith found that "[r]elative weakness was exhibited in [the claimant's] common sense reasoning and ability to exercise social judgment in practical situations and the ability to understand abstract relationships as contrasted to more concrete thought processes." (R. 101). Dr. Meredith determined the claimant to have intellectual functioning in the Mild Mental Retardation

range. (R. 101). Importantly, Dr. Meredith noted that the "current evaluation suggests a high degree of validity." (R. 102). Dr. Meredith concluded that the claimant's psychological impairment was slight, and his motivation and level of cooperation were average, and his judgment and logical reasoning were moderately impaired. (R. 102). Furthermore, Dr. Meredith concluded that the claimant's communication, social, and behavior functions were only mildly impaired; however, his capacity for making independent decisions was assessed as poor. (R. 102).

In October 2005, upon the request of the claimant's attorney, Dr. Blotcky, Ph.D., completed a psychological evaluation report of the claimant. (R. 113). Dr. Blocky found the claimant demonstrated logical and orderly thinking. (R. 114). However, Dr. Blocky noted the claimant's "abstract thinking was poor." (R. 114). Furthermore, though the claimant's judgment was "grossly intact," he used "poor judgment at times" and his "insight [was] minimal." (R. 114).

Dr. Blotcky administered a WAIS-III psychological test. (R. 114). The claimant obtained a Verbal IQ of 69, a Performance IQ of 69, and a Full Scale IQ of 66. (R. 114). Dr. Blotcky concluded that these scores placed the claimant in the Mildly Retarded range of intellectual abilities. (R. 114). Dr. Blotcky found that the claimant was motivated during the exam, and the test scores were valid. (R. 115).

Based on these findings, Dr. Blotcky diagnosed the claimant with oppositional defiant disorder.(R. 115). Dr. Blotcky noted that the claimant had multiple behavioral problems including argumentativeness, quick temper, breaking rules, physical fighting with peers, sexual activity for two years, and multiple suspensions from school. (R. 115). Furthermore, Dr. Blotcky recommended that the claimant be put in special education classes, and that "[a]t some point, [the

claimant] should be referred to an independent living program so that he can learn daily skills." (R. 115). Dr. Blotcky concluded the claimant's prognosis was poor because of "the combination of mental retardation and oppositional defiant disorder." (R. 115).

In the "Supplemental Questionaire as to Residual Functional Capacity," Dr. Blotcky found the claimant to have five "marked" impairments. (R. 116). First, the claimant had marked deficiencies in concentration, persistence, or pace resulting from frequent failure to complete tasks in a timely manner. (R. 116). Second, the claimant had a marked deficiency in the ability to respond to customary work pressures. (R. 116). Third, the claimant had a marked limitation in the ability to understand, carry out, and remember instructions in the work setting. (R. 116). Fourth, the claimant had a marked limitation on the ability to respond appropriately to supervision in a work setting. (R. 117). Finally, the claimant had a moderate to marked limitation to perform repetitive tasks in a work setting. (R. 117).

*Function Report*

In May 2003, the claimant's mother completed a Social Security Administration Child Function Report. (R. 62). In this report, the claimant's mother indicated the claimant had friends his own age, could make new friends, and generally got along with her and other adults. (R. 67). Additionally, she indicated that the claimant sometimes got along with his siblings and teachers. (R. 67). She further noted that the claimant played team sports (R. 67), and could take care of his personal hygiene. (R. 68). The claimant's mother added that the claimant "sometimes" keeps out of trouble and obeys the rules. (R. 68).

*ALJ Hearing*

On November 2, 2005, the ALJ hearing took place with the claimant and the claimant's

8

mother. ( R.122). The claimant's mother testified that the claimant was expelled from high school for fighting. (R. 128). Furthermore, she stated that the claimant had been slow and had lagged behind in school. (R. 131). She testified that the claimant was currently attending Birmingham Works for You, a church activities group. (R. 129). Since the claimant has been out of school in September 2005, the claimant's mother stated he has not fought. (R. 148).

In addition, the claimant's mother testified that the claimant had "different mood swings" and problems fighting with his brother. (R. 132). She said that the claimant rarely goes out, and does not have many friends. (R. 133). According to his mother, the claimant had no trouble sleeping. He talked on the phone, watched T.V. and listened to music. (R. 135). Furthermore, the claimant's mother testified she made him do chores. (R. 144). She stated she made him "wash, take out the trash. . . clean up the kitchen. . .[his] room and stuff like that." (R. 144). However, she testified that her soon was distant, likes to be by himself, and "basically just won't open up." (R. 144).

The claimant's mother further testified that the claimant had played football in a city league for eight years, but could no longer play because of his grades. (R. 146). Furthermore, the claimant used to play other organized sports as well.

Then, the claimant testified. (R. 152). The claimant stated that he had "no disciplinary problems" when he initially arrived at high school. (R. 153). Regarding the fight that led to his expulsion, the claimant testified that ten individuals began physically beating his brother before he "jumped in and then there was a big fight." (R. 154). Furthermore, the claimant stated that he had not been suspended for fighting prior to the expulsion incident, and had not been involved in many fights prior to that incident. (R. 154). The claimant added that only one fight report was

9

ever filed while he attended high school, and that report relating to the expulsion incident. (R. 160).

In addition, the claimant stated that he had been playing football on the school team prior to the fighting incident. (R. 156). Also, the claimant stated he was involved in a neighborhood organization where he engaged in "like every sport. . .just to keep me focused and out of trouble in the streets."(R. 156). Furthermore, the claimant stated he was taking classes to get his GED, and was involved in a "talk-it-out class," that focused on "how you're doing while you're at home" and family relations. (R. 158). When asked how he passes his time, the claimant stated that he goes to his friend's house to "play a game or play cards" on teams, or reads sports magazines. (R. 158-59). He also stated that he has not gotten into fights in the neighborhood, gets along "fine" with the neighborhood children, and has not been involved with the police. (R. 159). When asked about his relationship with his mother and father, the claimant stated the relationship was "[f]ine" and that he and his mother and father "communicate every night." (R. 160).

*ALJ Decision*

On January 27, 2006, the ALJ issued an unfavorable decision. (R. 18). Although Dr. Blotcky diagnosed the claimant with oppositional defiant disorder, the ALJ determined that the other evidence of record failed to show that the claimant's oppositional defiant disorder was a "severe" impairment because the impairment did not "impose more than slight abnormalities or more than minimal functional limitations." (R. 23).

The ALJ noted the lack of evidence supporting claims of a severe case of oppositional defiant disorder. (R. 23). The ALJ wrote "[o]ne would certainly believe that if the claimant had such a condition, there would have been some previous indications evidenced through school

10

records." (R. 23). The ALJ cited Dr. Meredith's findings that the claimant had an average relationship with his teachers, and a generally positive attitude about school. (R. 23). The ALJ further noted that Dr. Meredith found the claimant cooperative and socially appropriate. (R. 23). Although a "truly severe oppositional defiant disorder would color almost every aspect of the claimant's social life," the claimant "admitted that he gets along well with others, interacts with others through organized sports activities, plays cards," and generally had no serious disciplinary issues. (R. 23). The ALJ viewed the fight leading to the claimant's expulsion as an isolated incident. (R. 23)

The ALJ determined Dr. Blotcky's opinion was incongruent with both the record and the substance of Dr. Blotcky's own evaluation. (R. 23). The ALJ found that Dr. Blotcky provided no basis for diagnosing the claimant with oppositional defiant disorder other than "background information" that was "presumably given by [the claimant's] mother." (R. 23). And, although the background information indicated that the claimant had multiple suspensions from school, the ALJ emphasized that the records reveal *only one* school suspension. (R. 23). Though the claimant's mother indicated that the claimant only "sometimes" followed the rules, the ALJ noted that school records "fail[ed] to show any behavioral or disciplinary problems, except for one suspension for fighting." (R. 24). Moreover, the ALJ determined that the mother's testimony that the claimant fought often in the neighborhood was "contrary to the other evidence of record and contrary to [the claimant's] own testimony that he got along fine with other children in the neighborhood." (R. 24). Thus, other than the claimant's mother's testimony, the ALJ found there was no evidence that the claimant's oppositional defiant disorder resulted in "more than slight abnormalities or more than minimal functional limitations." (R. 24). Therefore, the ALJ

11

concluded the claimant's oppositional defiant disorder was not "severe," and the opinions of Dr. Blotcky were "unsubstantiated" and were thus "afforded little probative value." (R. 24)

The ALJ then addressed the claimant's allegations that he met or medically equaled Listing 112.05 (Mental Retardation). Each category, A through F, that independently satisfy meeting listing 112.05, were discussed. (R. 24). However, because the claimant alleges satisfying only 112.05D on appeal (Claimant's brief, p. 6), the other categories are not discussed in this opinion.

Listing 112.05D requires (1) a valid verbal, performance, or full scale IQ of 60 through 70 *and* (2) a physical or other mental impairment imposing an additional and significant limitation of function. *Id*.

Regarding whether the claimant met listing 112.05D, the ALJ determined that the claimant satisfied the first prong by obtaining IQ scores between sixty and seventy. (R. 25). However, the ALJ concluded that the claimant failed to satisfy the second prong because the claimant had "no physical impairment and no other mental impairment imposing an additional and significant limitation of function." (R. 25). The ALJ referenced his finding that the claimant's oppositional defiant disorder was "not severe." (R. 25). Thus, the ALJ concluded the evidence failed to establish that the claimant's impairment meets or medically equals a listed impairment. (R. 26).

Next, the ALJ turned to the second avenue for satisfying the listing: whether the claimant has an impairment, or combination of impairments that is "functionally equal" to listing 112.05D, and satisfies the twelve month duration requirement. (R. 26). In this analysis, the ALJ utilized the six "domains of functioning."(R. 26).

12

The first domain the ALJ addressed was *Acquiring and Using Information*. (R. 27). The ALJ noted that the claimant had not been in special education classes until recently, and has only had to repeat one grade. (R. 27). However, because the claimant had an IQ in the sixties, "which obviously limits his ability to acquire or learn information," the ALJ found the claimant had a "marked" limitation in this category. (R. 27).

Second, the ALJ addressed *Attending and Completing Tasks*. (R. 27). Citing Dr. Blotcky's opinion that the claimant did not have attention deficit hyperactivity disorder, and Dr. Meredith's opinion that the claimant's attention span was "adequate," the ALJ determined the claimant to have "moderate" limitations in this domain. (R. 28).

Third, the ALJ discussed *Interacting and Relating with Others*. (R. 28). The ALJ noted that the claimant necessarily cooperates with others by playing organized sports, and testified that he has friends. (R. 28). Contrary to what the claimant's mother stated, the ALJ found, as Dr. Meredith did, that the claimant's ability to relate to others was unimpaired. (R. 28). Thus, the ALJ concluded that the claimant had "less than 'moderate' limitations" in this domain. (R. 28).

The fourth domain of functioning the ALJ discussed was *Moving About and Manipulating Objects*. (R. 28). Because the claimant "plays football, basketball, video games, and skates," Dr. Meredith noted no limitation pertaining to the claimant's physical abilities. (R. 28). Based on the claimant's activities and Dr. Meredith's findings, the ALJ decided no limitation existed in this category.

Fifth, the ALJ addressed *Caring for Yourself* (Self-care). (R. 28). The ALJ noted that the claimant's mother stated that the claimant has no problems caring for his own personal needs. (R. 29). The ALJ added that the claimant "claims his own room and helps with other household

13

chores, such as taking out the trash and cleaning the kitchen." (R. 29). Furthermore, the claimant

"does not smoke, use street drugs, or drink alcohol."(R. 29). In this domain, the ALJ found no

limitations. (R. 29).

The sixth and final domain the ALJ discussed was *Health and Physical Well-Being*. (R.

29). The ALJ found that the claimant's mild mental retardation did not keep him from being

active in sports or attending school. (R. 30). Furthermore, the ALJ determined that the claimant's

lack of expression towards his family did not distinguish him from a typical teenage boy. (R. 30).

Therefore, in this domain, the ALJ found the claimant had no limitations. (R. 30).

Because the claimant did not have an "extreme" limitation in one area of functioning, or a

"marked" limitation in two areas, the ALJ determined that the claimant does not functionally

equal, singly or in combination, any listed impairment. (R. 30). Furthermore, because the

claimant did not have an impairment, or combination of impairments, which meets, medically

equals, or functionally equals any listing, the ALJ concluded that the claimant was not disabled

as defined by the Social Security Act. (R. 30).

## VI. Discussion

The claimant raises two issues. First, the claimant alleges that the ALJ failed to consider

the claimant's behavioral problems and diagnosed oppositional defiant disorder when

determining that the claimant failed the second prong of the 112.05D Listing. Second, the

claimant alleges that the ALJ improperly rejected the opinion of a consulting psychologist. This

court disagrees with respect to both issues.

### 1. The Claimant failed to show sufficient evidence that he satisfied the second prong of Listing 112.05D.

The claimant bears the burden of providing evidence that he was disabled under the Social Security Act. 42 U.S.C. § 423 (d)(5)(A). Furthermore, this court does not re-weigh evidence, decide facts anew, or make credibility findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Rather, the Commissioner's decision will not be disturbed if, in light of the record as a whole, substantial evidence supports his decision. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997).

Listing 112.05 defines mental retardation as "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 112.05. Meeting this definition through category 112.05D requires (1) a valid verbal, performance, or full scale IQ of 60 through 70 *and* (2) a physical or other mental impairment imposing an additional and significant limitation of function. *Id*.

That the claimant satisfies the first prong of Listing 112.05D is not at issue. Because the claimant argues that his impairments medically "meet" or "equal" the second prong, *and* that his impairments "functionally equal" the second prong of 112.05D under the child functional domain analysis, the court will now address these two independent ways of satisfying the second prong of 112.05D in turn.

### A. The Claimant failed to show his impairments medically met or equaled Listing 112.05D

To "meet" a Listing, "a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002). To medically "equal" a listing, the medical determinations must be "at least equal in severity and

duration to the listed findings." 20 C.F.R. § 404.1523(a)-(d); *Wilso*n, 284 F.3d, at 1224. If the additional impairment(s) did not cause limitations that are "severe" as defined in § 416.924(C), then the additional impairment(s) fails to impose the required additional and significant limitation of  function. 20 C.F.R. Pt. 404, subpt. P, App. 1 § 112.00A.

In the present case, substantial evidence supports the ALJ's determination that the claimant's alleged additional impairment of oppositional defiant disorder failed to impose an additional and significant limitation of function.  The ALJ noted that adequate evidence did not exist that the claimant had any behavioral disorder.

First, the ALJ determined the claimant's mother's testimony to be inconsistent, unsupported by the record as a whole, and therefore not credible. For example, during the ALJ hearing, the claimant's mother testified that the claimant often fought with others. However, in a separate questionnaire, the claimant's mother stated that the claimant had friends, had the capacity to make new friends, and played team sports. Furthermore, the claimant's own testimony at the ALJ hearing was consistent with his mother's questionnaire responses, but wholly inconsistent with her ALJ hearing testimony. Moreover, the record does not show any school disciplinary problems beyond the one fight that led to the claimant's suspension. In fact, as the ALJ noted, Dr. Meredith determined the claimant's relationship with his teachers to be average and his attitude about school to be positive.

Regarding Dr. Blotcky's opinion, the ALJ determined the record as a whole did not support his findings. Although Dr. Blotcky reported in his "background information" that the claimant had "multiple suspension from school," school records show only *one* suspension. Furthermore, Dr. Blotcky's determination that the claimant had multiple behavioral problems,

such as argumentativeness, quick temper, breaking rules, physical fighting with peers, is only consistent with the claimant's mother's testimony at the ALJ hearing, and inconsistent with Dr. Meredith's findings. For example, Dr. Meredith found the claimant to be "socially appropriate with good impulse control skills." In addition, Dr. Blotcky's opinion was inconsistent with school records reflecting only one fighting incident, and the claimant's own testimony regarding his normal daily activities. Therefore, substantial evidence supports the ALJ's conclusion that if the claimant indeed has oppositional defiant disorder, the limitations resulting from the claimant's condition are not "severe."         .

### B. The Claimant failed to show that his impairment functionally equaled Listing 112.05D

The claimant argues that his combination of "marked" impairments functionally equal Listing 112.05D. When considering whether a child's impairment *functionally* equals a listing, the regulations require the analysis of six domains. 20 C.F.R. § 416.926a(b)(1). These domains are "broad areas of functioning intended to capture all of what a child can and cannot do." *Id*. To satisfy the "functional equivalent" standard, a child claimant is required to show "marked" limitations in at least *two* domains, or an "extreme" limitation in at least one domain. *Id*. § 416.926a(d); *Henry v. Barnhart*, 156 Fed.Appx. 171, 174 (11th Cir. 2005). A "marked" limitation is an impairment that "interferes seriously with [the] ability to independently initiate, sustain, or complete activities," and is more than a moderate limitation. *Id*. § 416.926a(e)(2)(I).

Here, ALJ did determine that the claimant has a "marked" limitation in one functional domain, *Acquiring and Using Information*. Beyond this single "marked" limitation, however, the ALJ did not find any of the claimant's impairments limiting enough to be considered "marked"

17

in any other domain. The claimant does not argue that his impairments result in a "marked" limitation in any specific domain. Rather, the claimant points to a smattering of "marked" limitations Dr. Blotcky noted (Claimant's brief, p. 8), none of which specifically match any of the six domains, and argues, essentially, that Dr. Blotcky's findings should render the claimant disabled under the functional domains in some capacity. Thus, each of the five remaining domains will now be addressed.

First, the *Attending and Completing Tasks* domain considers how well the child focuses and maintains attention; begins, carries through, and finishes activities; and the ease with which he changes activities. Though Dr. Blotcky found the claimant had a "marked" impairment in ability to maintain attention for extended periods of time, Dr. Blotcky also concluded that the claimant did not have attention deficit disorder. Furthermore, the ALJ relied on Dr. Meredith's determination that the claimant's attention span was "moderate," and he did not have concentration problems. Even though the claimant's school records reflect some disciplinary problems related to focus and attention span, these records alone do not equate to the claimant having a "marked" impairment in this domain. The ALJ's decision to rely on Dr. Meredith's opinion, rather than the opinion of the claimant's mother or Dr. Blotcky's assessment, was entirely reasonable. Therefore, substantial evidence supports the ALJ's finding that the claimant had only moderate limitations in this domain.

Second, the *Interacting and Relating with Others* domain deals with how well the claimant sustains emotional connections with others, develops and uses the community's language, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. Though Dr. Blotcky found the claimant had a "marked"

18

impairment in the ability to respond appropriately to supervision in a work setting, the ALJ reasonably relied on multiple sources of evidence inconsistent with Dr. Blotcky's finding. Nothing in the record indicates that the claimant has had any problems respecting the possessions of others. Furthermore, the claimant has played organized sports, and testified that he had friends, and enjoyed playing games with them. These activities necessarily involve interacting and relating with others. Again, the ALJ properly relied on the opinion of Dr. Meredith. Dr. Meredith found the claimant's ability to cooperate with others was unimpaired.  Plainly, the only evidence supporting Dr. Blotcky's finding is the testimony of the claimant's mother, indicating that the claimant does not express his emotions well at home. Evidence that a teenage boy is emotionally distant is insufficient to override the ALJ's opinion that the claimant did not have a "marked" limitation. Therefore, substantial evidence supported the ALJ's finding in this domain.

Third, the *Moving About and Manipulating Objects* domain calls for an evaluation of the claimant's gross motor skills and fine motor skills. The ALJ correctly  noted that no evidence exists that claimant has any limitations in this domain. The fact that the claimant played athletic sports and video games, coupled with Dr. Meredith's failure to note any physical limitation, provides the substantial evidence in support of the ALJ's finding that no limitation exists here.

Fourth, the *Caring for Yourself* domain assesses how well the claimant maintains a healthy emotional and physical state. This assessment includes whether the claimant appropriately seeks and maintains physical and emotional wants and needs; copes with stress and environmental changes; and cares for his own health, possessions, and living area. Dr. Blotcky noted that the claimant had a "marked" impairment in the ability to deal with changes in a school or work routine. However, no evidence supports this finding. The claimant testified that he has adapted

19

fine to the church program he attended after leaving his high school. Nothing in the record contradicts the claimant's testimony. Furthermore, the claimant's mother stated that the claimant can take care of his personal needs. By all accounts, the claimant was always well groomed. Also, Dr. Meredith found that the claimant's "self-care skills were adequately developed." Therefore, substantial evidence supports the ALJ's finding that the claimant had no limitation in this domain.

Finally, the *Health and Physical Well-Being* domain deals with the cumulative physical restrictions upon functioning of physical and mental impairments and their associated treatments or therapies on the child's functioning not considered in the *Moving About and Manipulating Objects* domain. The claimant has no physical limitations. Although he has been diagnosed with mild mental retardation, this condition does not keep him from being active in organized sports, having friends, or attending school. Again, the fact that the claimant may not express himself to family members does not distinguish him from the typical teenage boy. This information provides substantial evidence necessary to support the ALJ's finding that the claimant has no limitations in this domain.

Therefore, because the claimant failed to show that his impairments result in "marked" limitations in more than one domain, the ALJ properly found the claimant not disabled under the Social Security Act.

**2. The ALJ properly rejected Dr. Blotcky's medical opinion**.

The claimant argues that the "[t]he ALJ has failed to properly consider the significant evidence from treating and examining sources." (Claimant's brief, p. 9). This argument is wholly unsupported.  Neither the claimant nor anything in the record indicate which source was treating

20

and which source was examining. However, because the ALJ relied upon Dr. Meredith's opinion, and rejected Dr. Blotcky's opinion, any error the ALJ committed had to have been in respect to Dr. Blocky's opinion. Nevertheless, *any* medical opinion can be rejected if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Here, Dr. Meredith's opinion was consistent with the record as a whole and with the ALJ's findings. On the other hand, the ALJ adequately discredited Dr. Blotcky's opinion. As stated above, neither  Dr. Meredith's opinion nor the record as a whole, other than the testimony of the claimant's mother, supports Dr. Blotcky's conclusions. Therefore, substantial evidence supports the ALJ's decision to discredit Dr. Blocky's opinion.

### VII. Conclusion

For the reasons stated above, this court AFFIRMS the Commissioner's decision. A separate order will be entered simultaneously with this opinion.

DONE and ORDERED this 15th day of July, 2009.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE